[No. 2114.]

## J. L. WINDHAM v. THE STATE.

POSSESSION OF RECENTLY STOLEN PROPERTY — DEFENDANT'S EXPLANATION THEREOF — CHARGE OF THE COURT — CASE STATED.— When the defendant's right to the animal for the theft of which he was on trial was first questioned, he asked his cousin who was present to respond. His cousin replied by describing the animal, and declaring it was not the animal inquired about, but was an animal which belonged to the defendant. The court having failed to instruct the jury as to the defendant's explanation of his possession when called in question, was requested by defendant to charge the jury as follows: "If you find from the evidence that the defendant took the animal mentioned in the indictment, and if you further find that the first time the defendant's right to said animal was called in question he gave an explanation of such possession, and that such explanation was reasonable, then you are instructed that it devolves upon the State to prove such explanation false, and a failure to do so will entitle the defendant to an acquittal." *Held*, that the refusal to give the charge was error, because it was correct in principle, and the explanation, when considered in connection with the evidence adduced, was reasonable.

APPEAL from the District Court of Brown. Tried below before the Hon. T. B. Wheeler.

The indictment contained two counts. The first charged the appellant with the theft of one head of cattle, the property of some person to the grand jurors unknown, in Brown county, Texas, on the 27th day of October, 1883. The second count charged the theft of the same animal and alleged the ownership in H. V. Smith. The appellant was convicted, and was awarded a term of two years in the penitentiary as punishment.

S. Blackwood, the first witness for the State, testified that he knew the yearling alleged to have been stolen by the defendant. It was an estray, and had been raised by the witness, from about July, 1882, until it disappeared two or three days before October 27, 1884. It was a heifer yearling, speckled in color between red and copperas, the dark spots being of a very peculiar color, never before seen by the witness on any animal. The spots were larger about the head, and decreased in size all the way down the back. It was in the mark and brand of its mother, the brand being the letters IX on the left hip, and R with a bar under it on the left side, and the mark a crop off the right ear and an overbit in the left. The animal described was never away from its range around the witness's place, from July 4, 1882, until about three days before October 27, 1883, during which time it was in the possession of the witness.

It was to have been sold under the estray law on the said 27th day of October, 1883. It was at the witness's house, and was salted by the witness on the Wednesday before the Saturday on which it was advertised to be sold. Some six or seven days after that Saturday, the witness found its hide, head, feet and tail at the defendant's lot, some thirty-five or forty yards from his house. The head was on the outside of the lot, denuded of the ears in the manner in which Texas cattle-men usually skin the heads of cattle. Some skin still adhered to the back of the head and the forehead. The feet were scattered about in the lot, and the hide was cut in strips about the width of a man's hand, and hung on the fence and some scrub trees which grew in the lot. Witness took the strips of hide and placed them together, and arranged the head, feet and tail with the strips, and reconstructed the hide of the animal described. Witness knew the animal perfectly by its flesh-marks, and was absolutely certain that the head, feet and tail belonged to the animal in question, and that the strips were cut from its hide. The yearling had a copper-colored strip on the inside of the right hind hoof, and it had small crumpled horns. There were red or copperas-colored spots upon its tail, and a bunch of hair in the center of the brush on its tail, of the same color. Witness had often handled the animal's tail, and had as often observed this peculiarity in the brush. The usual range of the yearling was in Brown county. Defendant was frequently on that range. The witness never gave the defendant his consent to take or use that animal. The witness got together, in strips, about one-half of the hide. A part of one of the strips which covered a rib was gone, and seemed to have been cut out. Witness did not pretend to say that the strips he got together covered any particular part of the animal. He meant only, that he got together, in strips, about one-half of the entire hide. The mother of the yearling was marked and branded as stated above, and was sold as an estray on October 27, 1883, the day on which the yearling was to have been sold. The yearling was regarded as an estray in the neighborhood. Witness never heard of its having an owner until it was claimed by H. V. Smith, of Callahan county, some time after it was killed .but before the indictment was found. Witness and defendant lived near each other in Brown county, Texas, in which county the animal described was taken. ·

Cross-examined, the witness stated that, on Thursday, after he salted the yearling on Wednesday, he was notified to get it up in readiness for the sale on Saturday. He hunted for the yearling throughout its usual range during the half of.Thursday, and all day

on Friday through the country adjacent to the defendant's house, and throughout every section of the country it had ever been known to go over. He hunted it again on half of the day on Saturday, and as much of the following Monday. He went to Cisco on Tuesday and returned on the following Thursday or Friday, and on the day after his return home he went to defendant's house to look at the head and hide found there, and to satisfy himself as to its being the head and hide of the missing animal. That part of the hide got together by the witness was from the left side of the animal. Witness did not swear upon a former trial of this case that he got together the whole of the left side of the hide, except a small piece about the width of a man's hand from along the back, running full length. Witness did not, on that trial, swear that he knew he got the entire hide together, except the missing strip, by fitting the spots together. He could not have so sworn unless he was crazy. Witness could not, after the lapse of so long a time since the former trial, remember exactly what he did swear on that trial. Besides, he had been sick, and his memory was not good. Witness could not swear that a part of the hide from the shoulder was gone. He could not locate the missing parts, except the strip from the back. He did not swear on the former trial that he knew the animal by its eyes. The eyes were closed when witness saw the head. The yearling ran with two of Mrs. Byrd's cows. The defendant's pen was about a hundred yards from the Cisco and Thrifty road, and in part was visible from that road. During the spring previous to this trial the witness saw an animal on the range about the color of the animal killed. It was, however, but a two-year-old, and witness did not look at its brand. Witness owned but six head of cattle at the time this yearling was missed, and could tell them all by their flesh-marks as far as he could see them, and was confident that he could have identified the hide of either one of the six after being cut into strips, as was done with the hide of the yearling.

Mrs. Blackwood, the wife of the first witness, testified that she knew the animal mentioned in the indictment, and she described it as her husband did. The witness saw it during the week before it was to be sold, and knew that her husband salted it on the Wednesday before the Saturday on which the sale was advertised to take place. On the following Wednesday witness saw it dead in the defendant's pen. The carcass was all there hanging up in trees, except a portion of the tenderloin, which was in a bucket in the shed-room of defendant's house. The fat, when seen by the witness, was being reduced to tallow in a vessel on the stove. The

hide was cut into strips, and the strips were hanging from trees in the lot. The head and feet were thrown outside of the pen, and the entrails were inside of the pen near a small pile of ashes. Witness did not go inside of the house, but stopped at the fence about ten steps distant, and in looking around for Mrs. Windham saw the meat and strips of hide hanging in the trees as described. Being confident that she had found the missing yearling, she went to the lot to verify her confidence. Witness saw the fat and head outside the lot. The eyes were still in the skull. The skull was denuded of the hide except a strip leading across the forehead between the horns, which was about an inch wide. The feet were skinned nearly to the hoof. Witness knew the hide, head and hoofs to be those of the estray yearling described. The peculiar copper-colored spots which distinguished the hide of the yearling were on that hide.

Cross-examined, the witness stated that she had several times known the yearling to go off. On some of those excursions it was gone a week, and a few times longer. On the Sunday before he went to Cisco, S. Blackwood asked Mr. Bowden to hunt for the animal. Witness knew the hide as soon as she saw it hanging in strips in defendant's lot, and readily recognized the head by the peculiar look of the eyes. Witness knew that yearling quite as well as she knew any one of her own children. She would have known the head without seeing the hide or meat. The hairy side of the hide, as it hung, was exposed. Witness went to, but not into the lot, and did not have the hide in her hands. Nevertheless she knew it to be the hide of the estray yearling, and no other.. The yearling had clear hoofs with red stripes, a peculiarity which witness had observed and discussed a hundred times with Mr. Blackwood. She was absolutely certain that the hoofs were not all dark, except that the right hind hoof had a copperas-colored stripe on the inside. The defendant's pen and the front of his house were in full view of the road. The yearling's eyes were perfectly natural in appearance when the witness saw them. The strips of hide hung in a post oak tree. Witness did swear on the former trial of this case that they hung in a live oak tree, and that she was as certain of that as of any other fact to which she testified. Witness so testified because the defendant's counsel persisted in asking her the kind of tree it was. Witness's recollection of events connected with this matter was fresher on that trial than on this. Witness had much work to do, much worry with children, had been in bad health, and her memory was not good.

R. L. Archer testified, for the State, that he was one of the county commissioners of Brown county in October, 1883. On the 27th day of that month he sold an estray cow for S. Blackwood, which was branded as stated by Blackwood in his testimony. Witness did not sell a yearling in that brand for Blackwood on that day. A short time after the 27th day of October witness had a conversation with H. V. Smith of Callahan county about the cow and yearling. Smith left witness, saying that he was going to see the defendant.

H. V. Smith testified, for the State, that in the fall of 1883, he was at the house of Esquire Archer in Brown county, Texas, and from there went to where the defendant was building a house, and told him that he had understood that he, defendant, had killed one of his yearlings, branded IX on the hip and R with a bar underneath on the side, which yearling had been in Blackwood's possession, or which had been running on Blackwood's range. Defendant replied that he had killed a beef, but not the yearling of the witness. Witness replied that he had been informed that the Blackwoods would swear that the animal he killed was the animal which ran near their house, and which was witness's yearling. Defendant then had some conversation with a young man who was cutting wood near by. He presently returned and said that if he had killed the witness's yearling he had killed it through mistake; that he wanted no trouble about it, and would pay for it, and that, as he had no money then, he would shortly remit the money to the witness. Some two months later the witness received a letter signed in the name of the defendant, and in the handwriting of another letter received by the same mail signed in the name of 'Squire Archer, saying that he, defendant, had no money, but if witness would come for it he would give witness another and as good a yearling as the one he had killed. Neither the defendant nor the young man with him told witness that the animal killed by defendant was a yearling branded IX which defendant owned, and was not the Blackwood yearling. Witness had never seen the yearling, and claimed it only because he was informed that it was the calf of a cow branded IX. He did not know that he had ever seen the mother, but the IX brand was the prevailing brand of a stock of cattle which witness had previously bought from Mr. Stephens, of Cisco.

Cross-examined, the witness testified that he was not positive that the young man chopping wood did not engage in the conversation about the yearling, but his best recollection was that the young man said nothing. He had a faint recollection that the defendant and

that young man stepped aside and had a few moments of private conversation, after which the defendant returned and said that if he had killed witness's yearling he had killed it by mistake and would pay for it.

W. H. Martin testified, for the State, that he was a member of the grand jury which presented the bill of indictment in this case. The grand jury investigated the case with reference to the question of the ownership of the animal, and reached the conclusion that it belonged to some person unknown.

On cross-examination, the defendant's counsel asked why the grand jury, in view of its opinion that the owner of the alleged stolen animal was unknown, incorporated a count in the indictment alleging the ownership to be in H. V. Smith? Witness replied that there was some evidence tending to establish the ownership in H. V. Smith, of Callahan county. Upon examination of the records and estray books of Callahan county, the grand jury reached the conclusion that Smith's title was doubtful, and the grand jury voted to allege the ownership as unknown. The evidence adduced before the grand jury was written down, and was turned over to the district attorney, who drew the indictment, the witness supposed, to suit himself. The State rested.

G. M. Royalty testified, for the defense, that he was a member of the trial jury in this case at a former term of the court. S. Blackwood testified on that trial that he knew the skull of the dead yearling by the eyes, and that he got together all of the left side of the hide except a strip along the back. Upon his cross-examination, this witness qualified his testimony by saying that it was possible that Blackwood, instead of testifying on that trial that he got together the half of the hide from the left side of the animal, may have testified that he got together the half of the hide. Witness thought, however, that he said he got the left half together, except a strip. Upon reflection witness was of impression that it was Mrs. and not Mr. Blackwood who, at the said trial, testified to the eyes in the skull.

P. B. Martin testified, for the defense, that he was a member of the trial jury in this case at a former term of the court. S. Blackwood testified on that trial that he got together the entire left side of the hide except a strip running along the back about as wide as a man's hand, and that he knew he so got the left side of the hide together just as it had been worn on the yearling, by arranging and fitting the spots. He testified further that there was no brand upon that part of the hide he found and identified. He made these statements upon his cross-examination.

Cross-examined, the witness testified that he did not recollect sitting on the jury in any other case at the last term of the court. He could not remember the names of the witnesses who testified on the former trial of this case. He could not remember the substance of the testimony of Chris De Busk. He had no particular recollection of anything else testified by Blackwood on that trial, but his attention had not yet been called to any other part of his testimony.

A. J. Windham was the next witness for the defense. He testified that he assisted the defendant to construct a house in October, 1883. About two hours before sundown one evening in that month, the defendant quit work to kill beef. When the witness passed the defendant's house next morning, shortly after sunrise, he saw a beef head that was then covered thick with dirt and surrounded by buzzards. The witness had been working on the house with the defendant a week or more before this, and continued to work with him for several days afterwards. The defendant, who was the witness's grand-nephew, lived at that time in a house situated about one hundred yards west from the Cisco and Thrifty road. His pen was behind his house, on high ground, and in plain view of the road, over which, at the time, there was much general travel.

James Kuykendall testified, for the defense, that he knew a yearling in the summer and fall of 1883, branded IX on the left hip, which the defendant claimed to own. It was a brindled, speckled heifer, and ran on the range near the defendant's house. Witness also knew the yearling known as the "Blackwood yearling." It was a brindle speckled yearling branded IX on the hip, and R with a bar underneath on the side. Witness last saw the defendant's yearling in the fall of 1883, and saw the Blackwood yearling as late as March, 1884, on Rail branch, about two and a half miles from Blackwood's house. Witness was with defendant when he saw the yearling last mentioned, and defendant remarked: "There is the yearling Blackwood accused me of killing."

Cross-examined, the witness testified that the animal referred to by defendant and pointed out to witness by defendant when he said it was the animal he was accused of killing was branded IX on the hip and R with a bar under it on the side. Witness and defendant were going west at the time, and the animal stood with its head west, and north of the witness and defendant, and about ten steps off. Witness saw the brands plainly. He possibly would not have noticed the brand had his attention not been called to it by defendant. Witness knew that this occurred about March 1, 1884, because it happened a few days after witness commenced work for J. H.

Byrd, which was on February 26, 1884. The color and flesh-marks of that animal were similar to those of yearlings which belonged to the defendant and Blackwood. Witness took more particular notice of the brand than of the color of the animal. Witness never told any one that he saw this animal on March 1, 1884, until after the indictment of the defendant.

M. S. Byrd testified, for the defense, that he knew that the defendant had two cows and a yearling branded IX on the left hip, in 1883. The yearling was a red or brown white-speckled animal. Witness first saw it when it was a calf in Gilleland's pasture in Callahan county. It was a late summer calf, and when witness saw it in Callahan county was still sucking its mother. Witness last saw that animal in the fall of 1883, at which time it was on its range near the defendant's house. Witness, who had charge of his mother's stock of cattle, was much of his time on the range. Witness knew the Blackwood yearling well, having often seen it in Blackwood's pen and on the range. Witness last saw the last mentioned yearling on Rail branch, some two or three miles from Blackwood's house. This was in February or March, 1884.

Cross-examined, witness testified that he and the defendant were brothers-in-law. Defendant was with the witness on the range often, and knew the Blackwood yearling. When the witness saw the Blackwood yearling in the spring of 1884, he knew that defendant had been accused of killing it, but he told no one that he had seen it alive. He did not tell Blackwood until after this indictment was found. He did not at that time know that defendant had been charged with the theft of that yearling, but did know that Blackwood accused him of having killed it. Witness was of the opinion that he saw the Blackwood yearling on Rail creek as late as December, 1884, but was not certain. Witness told no one of having seen the Blackwood yearling, because that fact made no impression on his mind that it was important until after the indictment was found.

Lee Windham, the second-cousin of the defendant, testified in his behalf that he was living with and working for the defendant in October, 1883, and had then been with him about two months. Witness assisted defendant to drive up and butcher a beef in October, 1883. They butchered a brown speckled yearling, branded IX on the left hip. Witness had known that animal for two months, during which time it ran on the range about the defendant's house, and was claimed by the defendant as his property. Defendant, witness and witness's father were working on a house at the time this yearling was butchered. They quit work one evening in October,

1883, before sundown, drove the yearling up, and butchered it. That yearling had no brand other than the one described. No other yearling was killed at defendant's house during the time witness stayed there. The witness was present and heard, in part, a conversation between the defendant and one H. V. Smith, in the fall of 1883. Smith called the defendant aside and had some private talk with him while the witness was cutting wood. Defendant called the witness, and told witness to describe to Smith the yearling they butchered. Witness told Smith that it was a brown speckled yearling, branded IX on the left hip; that it had no other brand, and that it was the defendant's yearling.

Cross-examined, witness testified that he knew, when Smith was talking to defendant, that the animal they had killed was not the Blackwood yearling. He knew as much when he heard the defendant promise to pay Smith for it. Defendant's IX yearling ran on the same range that the Blackwood yearling did, which range was near the defendant's house. It (defendant's yearling) ran with a bunch of Elijah De Busk's cattle. The witness knew the Blackwood yearling well, and knew it from defendant's yearling. Witness knew that the yearling he and defendant killed was not the Blackwood yearling, and knew that fact when the animal was killed. The witness saw the Blackwood yearling a week or two after the killing of the defendant's yearling, about a mile west of Blackwood's house. Witness had then quit the employ of the defendant and was on his way home. Witness lived with his father about three miles west of Blackwood. Witness told no one that he saw the Blackwood yearling at that time. Witness shortly went to Mexico and did not return until after the last term of court. The defense closed.

J. H. Prater testified, for the State in rebuttal, that he lived in the same neighborhood Blackwood did. He knew the Blackwood yearling. He had never seen another than the Blackwood yearling on that range branded IX. Witness knew De Busk's cattle, but he had never seen a yearling branded IX running with them. Witness had never heard Lee Windham's character for truth and veracity questioned.

Cross-examined, witness said that a bull branded IX on the hip and R with a bar under it ran with De Busk's cattle, but witness had never seen it. Witness declined to swear that a brown and white speckled yearling branded IX did not run with De Busk's cattle in 1883, but if such a yearling did run with those cattle in that year witness did not know it. Witness, though often on the range, had never seen the Blackwood yearling since the fall of 1883.

Elijah De Busk testified, for the State in rebuttal, that he lived about two miles and a half from the house of Blackwood, and about the same distance from the house of the defendant. If a brown or red speckled yearling, branded IX, ran with witness's cattle, or on his range, in 1883, witness did not know it. Witness knew the Blackwood estray yearling. It ran on the range near Blackwood's house.

Cross-examined, witness testified that he was unable to say that he had seen every animal that ran with his cattle. Such a yearling as that described may have run with witness's cattle and witness not have seen it. Witness had not seen the Blackwood yearling since the fall of 1883.

S. Blackwood, recalled by the State, testified in rebuttal that he had been much on the range since October, 1883, and had seen nothing of the estray yearling since he saw its head, hide and feet in defendant's cow pen. He had often been on the range prior to October, 1883, and at no time saw an animal bearing the IX brand, except the estray yearling described. Witness had been but little on Rail branch.

The motion for new trial raised the question discussed in the opinion.

*Scott & Jenkins*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge. When defendant's right to the yearling in controversy was first challenged, one Lee Windham was present, and Lee Windham testified on the trial that defendant called upon him to state to Smith, the person who was questioning defendant about the yearling, what kind of a yearling it was that defendant and witness had killed, and that witness told Smith, in defendant's presence, the kind of yearling, describing the same minutely, and that it was defendant's yearling, and not the yearling inquired about and claimed by said Smith.

Defendant requested a special charge as follows: "If you find from the evidence that the defendant took the animal mentioned in the indictment, and if you further find that the first time the defendant's right to said animal was called in question he gave an explanation of such possession, and that such explanation was reasonable, then you are instructed that it devolves upon the State to prove such explanation false, and a failure to do so will entitle the defendant to an acquittal." This charge was refused, and the

court gave no charge whatever upon this phase of the case, and the defendant excepted to the court's charge in this respect.

The special charge requested is certainly correct in principle. (*Miller* v. *The State*, 18 Texas Ct. App., 34, and cases therein cited.) And in our opinion it was demanded by the evidence in the case. That the explanation of the defendant's possession of the yearling in controversy was made by the witness Lee Windham does not make it any the less the explanation of the defendant. It was made at defendant's request and in his presence, and was sanctioned by him. It would have been evidence against him, and should be evidence for him. It was in law his own statement and explanation. (*Garcia* v. *The State*, 26 Texas, 209.) In view of the evidence in the case the explanation was reasonable. There was positive evidence that the yearling which the defendant killed, and which he was convicted of stealing, was his own property.

We are clearly of the opinion that the court erred in failing to instruct the jury as requested in the said special charge, and because of this error the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered November 25, 1885.]